476 P.2d 657

**APACHE COUNTY et al., Appellants,**

v.

**The ATCHISON, TOPEKA AND SANTA FE
RAILWAY COMPANY, and Southern
Pacific Company, Appellees.**

**No. 9946.**

Supreme Court of Arizona,
In Banc.

Nov. 13, 1970.

Gary K. Nelson, Atty. Gen., Phoenix, by Robert O. Lesher, Tucson, Stanley Z. Goodfarb, John M. McGowan, James D. Winter, Asst. Atty. Gen., Phoenix, for appellants.

Fennemore, Craig, von Ammon & Udall, Phoenix, for The Atchison T. & S. F. Ry. Co.

Evans, Kitchel & Jenckes, Phoenix, Robert L. Pierce, San Francisco, Cal., for Southern Pac. Co.

STRUCKMEYER, Vice Chief Justice.

The Atchison, Topeka and Santa Fe Railway Company and the Southern Pacific Company, the State's two principal railroads, brought similar actions to recover ad valorem property taxes paid under protest for the year 1968 and for one-half of the year 1969. The actions having the same issues were consolidated and as consolidated heard and decided. Judgments on amended and supplemental complaints were entered, favorable in part to the railroads, ordering that the assessed valuation of the railroad properties for tax purposes be reduced from 60% to 40% of full cash value. From the judgments, the State has appealed and the railroads have cross-appealed.

In 1967, Arizona's Legislature, after a four-year study of all property within the State revised many of its tax laws. A legislative scheme assessing real and personal property by classes for taxation purposes was adopted, and, because taxes were reduced in some areas and because there was a need for increased revenues in aid to education, income, sales, luxury, and other excise taxes were increased.

By A.R.S. § 42–136,[1] the Legislature for tax purposes placed all real and personal

1. "§ 42–136. Classification of property for taxation

There are established the following classes of property for taxation:

1. Class one:

(a) Flight property valued under the provisions of §§ 42–701 through 42–705.

(b) All real and personal property used in the operation of private car companies valued under the provisions of §§ 42–741 through 42–748.

(c) All real and personal property of railroad companies used in the continuous operation of a railroad valued under the provisions of §§ 42–761 through 42–766.

(d) Producing mines and mining claims, the personal property used thereon, the improvements thereto and the mills and smelters operated in conjunction therewith valued under the provisions of § 42–124.

(e) Standing timber.

2. Class two:

(a) All real and personal property used in the operation of telephone and tele-graph companies valued under the provisions of §§ 42–791 through 42–795.

(b) All property, both real and personal, of gas, water and electric utility companies and pipeline companies valued under the provisions of § 42–124.01.

3. Class three:

All real and personal property devoted to any commercial or industrial use other than property included in classes one, two and four, including but not limited to land, the improvements thereto or any part of such land or improvements leased or rented for residential use.

4. Class four:

(a) All real property and the improvements thereto, if any, used for agricultural purposes, and all other real property and the improvements thereto, if any, not included in classes one, two and three.

(b) All personal property used for agricultural purposes, and all other personal property not included in classes one, two and three. Added Laws 1967, 3rd S.S., Ch. 6, § 2."

property in Arizona in four classes. The real and personal property of railroad companies used in the continuous operation of a railroad was placed in Class One. By A.R.S. § 42–227, subsec. B, par. 1,[2] for tax purposes Class One properties are assessed at 60% of their full cash value.

It is the State's position that the placing of railroad properties in a classification requiring their assessment at 60% of full cash value is a constitutional exercise of legislative discretion and that the reduction from 60% to 40% ordered by the Superior Court was a judicial reclassification wholly unauthorized by law. It is the railroad's position that the statute under which the 60% assessment was levied was unconstitutional and that all taxes paid under protest, not simply the difference between 40% and 60% of the full cash value of their properties, may be recovered.

In considering the respective positions of the parties, any notion that Arizona's exaction is confiscatory or grossly oppressive should immediately be dispelled. The record reveals that the Southern Pacific Company's property taxes in Arizona in 1968 were reduced from $6,216,721 to $4,801,222 by the legislative changes of 1967. In 1968 it earned $82,234,832 in its Arizona operations, paid $4,781,036 in ad valorem property taxes, and a total of $5,067,097 in all taxes. While the Southern Pacific Company paid a greater percentage of its Arizona derived income in real property taxes to Arizona than California derived income to California, comparison of excise taxes showed that the Southern Pacific Company paid to California $2,746,287 in sales taxes, but to Arizona only $127,837. In state income taxes, the Southern Pacific Company paid $1,107,595 to California, but only $114,280 to Arizona. While gross revenues from California income were nearly four times more than Arizona revenues, the sales taxes payments in California were thirty times more and the income taxes payments were nearly ten times more. The evidence concerning the Santa Fe Railroad is not as extensive, but it does establish that its total taxes system-wide were 4% of its gross revenue in 1968. Its total taxes in California were 6.4% of its California revenue, while in Arizona its taxes were 4.9% of its Arizona revenue. By comparison, the evidence discloses that the total taxes in 1968 of the trucking companies operating in Arizona equaled 16½% of their Arizona gross revenue for the year 1968.

The railroads' arguments as to the unconstitutionality of §§ 42–136 and 42–227 fall basically into three categories: first, the statutes violate the uniformity clause, Article IX, § 1 of the Constitution of Arizona, A.R.S.; second, the classification to be found in § 42–136 imposes an undue burden upon and discriminates against interstate commerce; and third, the classification violates the due process clause of the Constitution of Arizona, Article II, § 4, and the due process and equal protection

---

2. "§ 42–227. Valuation of property at market value, separate valuation of land and improvements; basis for determination of assessed valuation

A. For property tax purposes the valuation of all taxable property shall be determined at its market value. The valuation of land and improvements thereon shall be determined separately. The combined valuation of all land and improvements shall not exceed the market value of the total property.

B. As a basis for determining the assessed valuation for the different classes of property specified in § 42–136, the following percentages shall apply:

1. Class one: sixty per cent of its full cash value.

2. Class two: forty per cent of its full cash value.

3. Class three: twenty-five percent of its full cash value.

4. Class four: eighteen per cent of its full cash value.

C. The valuation determined for producing oil and gas interests valued under the provisions of § 42–124 and §§ 42–227.01 through 42–227.04 shall be the assessed valuation for such property.

D. Upon preparation of the rolls, the assessor shall apply the appropriate percentage to the full cash value of all property so that the assessed valuation will be shown thereon. As amended Laws 1967, Ch. 107, § 18; Laws 1967, 3rd S.S., Ch. 6, § 3."

provisions of the Constitution of the United States.

The railroads urge that the statute violates the uniformity clause of the Constitution of Arizona because the real and personal property of railroads has been subjected to substantially higher rates of taxation than the rates applied to similar property owned by other taxpayers.

The uniformity clause, Article IX, § 1 of Arizona's Constitution in its pertinent part reads:

"All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax, * * *."

This constitutional provision is not a counterpart of the equal protection clause of the Fourteenth Amendment to the Federal Constitution. The Supreme Court of the United States observed in Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254:

"This Court has previously had occasion to advert to the narrow and sometimes cramping provision of these state uniformity clauses, and has left no doubt that their inflexible restrictions upon the taxing powers of the state were not to be insinuated into that meritorious conception of equality which alone the Equal Protection Clause was designed to assure. [Citation omitted]" 310 U.S. at 368, 60 S.Ct. at 971.

Since Article IX, § 1 is a restriction upon taxing power of the state, we will not extend its meaning beyond the strict demands of the language used.

■ Article IX, § 1 requires that taxes be uniform upon the same class of property. It does not itself classify property nor does it purport to embrace a scheme for the classification of property. The power to classify is legislative. Peoples Finance & Thrift Co. v. Pima Co., 44 Ariz. 440, 38 P.2d 643. It is a power inherent in the state, Daube v. Oklahoma Tax Commission, 194 Okl. 487, 152 P.2d 687, and the state may exercise a wide discretion in selecting the subjects of taxation, New York Rapid Transit Corp. v. New York, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024. The only restraint placed upon the legislature by this provision is that when property has once been classified the rate must be uniform upon all property of the same class. 508 Chestnut, Inc. v. City of St. Louis [Mo.], 389 S.W.2d 823, cert. denied, 382 U.S. 203, 86 S.Ct. 400, 15 L.Ed.2d 271; City of Cape Girardeau v. Fred A. Groves Motor Co., 346 Mo. 762, 142 S.W.2d 1040.

"The moment we concede the power to classify, we have disposed of the question of uniformity; for then all that is required by the constitution is that the taxes shall be uniform upon the members of a class." Commonwealth v. Delaware Div. Canal Co., 123 Pa. 594, 16 A. 584, 590.

■ A close scrutiny of the language used by the Legislature in §§ 42–136 and 42–227 points to what superficially may be a source of confusion. A class may be the grouping together of persons or things for a common purpose or it may be a ranking of persons or things possessing the same attributes. Vol. 1 Bouv. Law Dict. 3rd Rev. p. 502. It is in the former sense that the Legislature used the word "class." Four classes of properties were created by the grouping together of dissimilar things for the purpose of assessing different percentages of full cash value. The word "class," however, in Article IX, § 1 is obviously used in the latter sense, meaning the grouping of persons or things possessing common attributes. In this sense, all the real and personal property of railroads are a class and all the subjects of taxation, as, for example, flight property, the property of producing mines and standing timber, etc., are each separate classes.

The railroads urge that real property is itself a class and that personal property having the same characteristics, such as tractors and radios, are each a class which under Article IX, § 1 must be uniformly taxed. But the classifications of property as advanced by the railroads are not the classifications which the Arizona Legislature has chosen. The Legislature, by §

42–136 has classified all the real and personal property of railroad companies used in the continuous operation of a railroad separately from all other properties in Arizona. Separate classification by a state of railroad property has been held valid under both state and Federal constitutions. Rapid Transit Corp. v. New York, supra.

■ The railroads' argument as to real property was long ago laid to rest by the holding of the U. S. Supreme Court in Kentucky Railroad Tax Cases (Cincinnati, N. O. & T. P. R. Co. v. Com.), 115 U.S. 321, 6 S.Ct. 57, 29 L.Ed. 414:

> "The discrimination against railroad companies and their property, which is the subject of complaint, as being unjust and unconstitutional, arises from the fact that, in the legislation of Kentucky on the subject, railroad property, though called real estate, is classed by itself as distinct from other real estate, such as farms and city lots, and subjected to different means and methods for ascertaining its value for purposes of taxation, and differing as well from those applied to the property of corporations chartered for other purposes, such as bridge, mining, street railway, manufacturing, gas and water companies.
>
> \* \* \* \* \* \*
>
> But there is nothing in the Constitution of Kentucky that requires taxes to be levied by a uniform method upon all descriptions of property. The whole matter is left to the discretion of the legislative power, and there is nothing to forbid the classification of property for purposes of taxation and the valuation of different classes by different methods. The rule of equality, in respect to the subject, only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances." 115 U.S. at 336–337, 6 S.Ct. at 63.

We note also that under classifications acts two identical articles of personal property in the hands of different owners, when applied to different uses and consequent productivity, may be placed in different classes, and subjected to different burdens of taxation. Wheir v. Dye, 105 Mont. 347, 73 P.2d 209.

One further matter should be considered before leaving the discussion of Article IX, § 1. It is apparent that the judgment of the Superior Court directing that the railroads be treated as though their properties were in Class Two is, in effect, a judicial reclassification. By the Arizona Constitution, Article III, the powers of government are divided into three separate departments and no one department may exercise the powers belonging to the others. We have repeatedly said in citing to Article III that a court cannot legislate, but its duty is to construe the law as written by the Legislature. State Tax Commission v. Quebedeaux Chevrolet, 71 Ariz. 280, 226 P.2d 549; Collier v. O'Neil, 63 Ariz. 320, 162 P.2d 124; Reichenberger v. Salt River, etc. District, 61 Ariz. 465, 150 P.2d 758

■ In Southern Pacific Company v. Cochise County, 92 Ariz. 395, 377 P.2d 770, we quoted with approval from Yellowstone Pipe Line Co. v. State Board of Equalization, 138 Mont. 603, 358 P.2d 55, cert. denied, 366 U.S. 917, 81 S.Ct. 1095, 6 L.Ed. 2d 241. There, the Montana court in reaffirming the holdings of their former decisions stated the purpose sought to be attained by classification statutes:

> "The purpose of the classification statute, \* \* \* [citation omitted] is to 'shift the burden of taxes from property, as such, to productivity, or, in other words, to impose the burdens of government upon property in proportion to its use, its productivity, its utility, its general setting in the economic organization of society, so that every one will be called upon to contribute according to his ability to bear the burdens, or as nearly so as may be, \* \* \*.'" 358 P.2d at 64.

Since only the Legislature may classify, only the Legislature has the discretion to impose the burdens of government on property in proportion to use, productivity and utility. The judgment of the Superior Court in effecting a judicial reclassification is palpably unconstitutional and void.

The railroads argue that the Arizona tax statutes impose an undue burden on and discriminate against interstate commerce. This problem of reconciling the revenue needs of the various states with the national interest in preserving commercial freedom across state boundaries has been the subject of much litigation.

■■ At the start, it may be said that certain principles have been firmly settled. *First,* a state may constitutionally levy a property tax on tangible property that is permanently located within the state, even though such property is part of an interstate enterprise. See Norfolk & W. R. Co. v. Missouri State Tax Commission, 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201, reh. den. 390 U.S. 1046, 88 S.Ct. 1633, 20 L.Ed.2d 311; Com. of Virginia v. Imperial Coal Co., 293 U.S. 15, 55 S.Ct. 12, 79 L. Ed. 171. *Second,* a non-domicilliary state may constitutionally levy a property tax on the intangible property of interstate enterprises, provided the tax is apportioned to the intangibles attributable to business operations within the state. *See* Norfolk & W. R. Co. v. Tax Commission, supra; Adams Express Co. v. Ohio State Auditor, 166 U.S. 185, 17 S.Ct. 604, 41 L.Ed. 965.

The railroads do not base their "undue burden" argument on a claim that Arizona is taxing property which is not attributable to state operations. To the contrary, it is their position that the full cash value established for each railroad's Arizona properties is correct. Rather, the railroads argue that the amount of the property tax levy constitutes an undue burden on commerce at least to the extent that they are assessed as "Class One" properties rather than as either "Class Two" or "Class Three" properties.

■■ It is not, however, an undue burden on interstate commerce to assess property at 100% of full cash value, Nashville, C. & St. L. Railway v. Browning, supra, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254, provided the property assessed is attributable to state operations. Indeed, individual items may in effect be taxed at more than full cash value under the "unit rule" concept, because the value of the system as a whole may exceed the value of the separate items. *See,* e. g., Railway Express Agency v. Com. of Virginia, 358 U.S. 434, 79 S.Ct. 411, 3 L.Ed.2d 450; Adams Express Co. v. Ohio State Auditor, supra. It cannot, therefore, be per se unduly burdensome to assess the Arizona properties of each railroad at 60% of full cash value. Railroads differ in so many respects from other properties that they may, as a class, be taxed differently or additionally. Southern Ry. Co. v. Watts, 260 U.S. 519, 43 S.Ct. 192, 67 L.Ed. 375.

The railroads advance the argument that discrimination against interstate commerce is established because most intrastate enterprises are placed in classes assessed at a lower percentage of full cash value, for example, commercial and industrial enterprises in "Class Three" (25%) and agricultural enterprises in "Class Four" (18%). Moreover, they point out that public utilities and some other forms of carriers, both intrastate and interstate, are placed in classes assessed at lower percentages of full cash value, for example public utilities and pipe line companies in "Class Two" (40%) and truck and bus lines in "Class Three" (25%). The test of appellants' position is whether the state statute in its practical operation discriminates against interstate commerce. Best & Co. Inc., v. Maxwell, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275.

The evidence established that there are four short-line railroads located wholly within Arizona. By the Arizona enactment, all railroad properties in Arizona, whether a part of an interstate operation or otherwise, are assessed the same—that

is, at 60% of full cash value. Plainly Arizona distinguishes between various types of enterprises and not between the intrastate and interstate character of the enterprises. While some business competitors of the railroads are placed in classes which subject them to a lower exaction, this is at best only discrimination between various types of business rather than discrimination against interstate commerce.

Moreover, we do not understand that the commerce clause prohibits classification of different industries that compete in the same markets for the same business. On the contrary, tax classifications have been upheld based on the difference between butter and oleomargarine, Magnano Co. v. Hamilton, 292 U.S. 40, 54 S.Ct. 599, 78 L. Ed. 1109, and between anthracite and bituminous coal, Heisler v. Thomas Colliery Co., 260 U.S. 245, 43 S.Ct. 83, 67 L. Ed. 237. For example, in Heisler the court said:

"The fact of competition may be accepted. Both coals, being compositions of carbon, are, of course, capable of combustion and may be used as fuels, but under different conditions and manifestations; and the difference determines a choice between them even as fuels. By disregarding that difference and the greater ones which exist, and by dwelling on competition alone, it is easy to erect an argument of strength against the taxation of one and not of the other. But this may not be done. The differences between them are a just basis for their different classification; and the differences are great and important." 260 U. S. at 256–257, 43 S.Ct. at 85.

The answer then to the railroads' argument is that the differences out of which the railroad claim of discrimination arises are the very basis for sustaining classification and different treatment. Were it discriminatory to treat different properties differently, no system of classification could withstand the charge of an unconstitutional discrimination against interstate commerce.

Finally, the railroads contend that the Arizona tax classification violates the Federal Equal Protection Clause and Arizona's Due Process Clause, in that it differentiates between railroads, public utilities, and other forms of carriers. The trial court concluded that there was no reasonable basis upon which the classification scheme might be supported. In this we think the trial court also erred.

In this area, the law is well settled. It was most recently discussed in Allied Stores of Ohio v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959).

"The applicable principles have been often stated and are entirely familiar. The States have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests. Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value [citations omitted].

\* \* \* \* \* \*

But there is a point beyond which the State cannot go without violating the Equal Protection Clause. The State must proceed upon a rational basis and may not resort to a classification that is palpably arbitrary. The rule often has been stated to be that the classification 'must rest upon some ground of differ-

ence having a fair and substantial relation to the object of the legislation.' [Citations omitted.] 'If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' [Citations omitted.] That a statute may discriminate in favor of a certain class does not render it arbitrary if the discrimination is founded upon a reasonable distinction, or difference in state policy. [Citations omitted]" 358 U.S. at 526–528, 79 S.Ct. at 440.

The applicable test is more succinctly stated in Walters v. City of St. Louis, 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660:

"The power of the State to classify according to occupation for the purpose of taxation is broad. Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." 347 U.S. at 237, 74 S.Ct. at 509.

■ One purpose of a property tax classification scheme is to raise those revenues necessarily borne by property taxes. It has been recognized that those groups specially benefiting from or specially burdening society may be required to pay additional taxes.

"Since carriers or other utilities with the right of eminent domain, the use of public property, special franchises or public contracts, have many points of distinction from other businesses, including relative freedom from competition, especially significant with increasing density of population and municipal expansion, these public service organizations have no valid ground by virtue of the equal protection clause to object to separate treatment related to such distinctions. Carriers may be treated as a separate class (compare Seaboard Air Line v. Seegers, 207 U.S. 73, 28 S.Ct. 28, 52 L.Ed. 108) and, as such, taxed differently or additionally. [Citation omitted.]" New York Rapid Transit Corp. v. New York, supra, 303 U.S. at 579, 58 S.Ct. at 724.

It is true, as the railroads argue, that public utilities also have special rights and powers such as eminent domain, the use of public property, and special franchises; that motor carriers present nearly equivalent problems with respect to environmental attractiveness; and that highways also tend to divide communities, affect urban development, create traffic problems, and affect drainage and sewerage. *However*, no public utility or other form of carrier shares equally the benefits or creates the same problems as do the railroads. It is in part for this reason that the railroads have traditionally been taxed differently or additionally.

The record discloses that another purpose for the legislative classification was to decrease the State's reliance on property taxes and shift to other forms of taxation. Such a shift was necessary because the heavy reliance by school districts on property taxes was proving inequitable in low, fixed-income districts. Accordingly, the Legislature passed a three-part tax package. First, property tax revenues were generally decreased as to all groups of taxpayers, including the railroads. Second, State aid to education was increased so that the school districts would not have to rely as heavily on property taxation. Third, new revenue measures were enacted to make up for the loss in property tax revenues and the increase in State aid to education. These measures included an increase in State individual and corporate income tax rates, increases in State sales taxes in selected areas, an increase in State luxury taxes, and a disallowance of certain sales and use tax exemptions.

Historically, the railroads have paid 95% of their Arizona taxes in the form of property taxes as compared with a state-wide average of 38%. The Legislature was undoubtedly aware that any decreases in the railroads' property taxes would not be

made up by other taxes. It therefore, with reason, placed the railroads in "Class One," both to assure the desired yield of the tax package as a whole, and to equalize to some extent the burdens of taxation within the State. We have held that such considerations are adequate grounds justifying classification. In State Tax Comm. v. Shattuck, 44 Ariz. 379, 38 P.2d 631, we quoted with approval from Commonwealth v. Delaware Div. Canal Co., 123 Pa. 594, 16 A. 584:

"Nor is Classification necessarily based upon any essential difference in the nature, or indeed in the condition, of the various subjects. It may be based as well upon the want of adaptability to the same methods of taxation, or upon the impracticability of applying to the various subjects the same methods, so as to produce just and uniform reasonable results, or it may be based upon well-grounded considerations of public policy. Hence, it is that some classes of corporations are taxed upon net earnings or income; others, upon capital stock, the value thereof to be ascertained by their annual dividends, or, in a certain event, upon the actual value of the shares; others upon their gross receipts; insurance companies upon the gross amount of their premiums; coal and mining companies at a specific sum for every ton of coal mined, etc. * * * Illustrations might be multiplied to show that classification does not depend upon differences in the physical natures or conditions of the subjects selected, but upon a variety of considerations." 44 Ariz. at 398–399, 38 P.2d at 631 at 639.

The record disclosed that in 1968, the first year under the reorganized tax program, the railroads paid 5 to 6½% of their Arizona gross revenue in total State taxes, while two major electrical utilities paid 15 to 18% and trucking companies 16½% of their gross revenues. We simply cannot say that the disparate treatment of railroads as compared with public utilities and other carriers rests upon unreasonable considerations of difference or policy.

One final comment. The record below is replete with suggestions that the railroad industry as a whole is in an economic decline and that the Arizona tax scheme will only aggravate the problems. These are practical arguments which must be addressed to the Legislature and are not for the courts.

"Our disapproval of the wisdom or fairness of so doing is not a ground for interference [Citation omitted] 'When a state Legislature acts within the scope of its authority it is responsible to the people, and their right to change the agents to whom they have entrusted the power is ordinarily deemed a sufficient check upon its abuse. When the constituted authority of the State undertakes to exert the taxing power, and the question of the validity of its action is brought before this court, every presumption in its favor is indulged, and only clear and demonstrated usurpation of power will authorize judicial interference with legislative action.' [Citation omitted]." Walters v. St. Louis, supra, 347 U.S. at 237–238, 74 S.Ct. at 510.

The judgment of the Superior Court of Maricopa County is reversed with directions to enter judgments in favor of the defendant counties and for their costs incurred.

McFARLAND and HAYS, JJ., and FRANCIS J. DONOFRIO, P. J., Court of Appeals, and WARREN L. McCARTHY, Superior Court Judge, concur.

NOTE: Chief Justice LORNA E. LOCKWOOD and Justice JESSE A. UDALL having disqualified themselves, Judges DONOFRIO and McCARTHY were called to sit in their stead and participate in the determination of this matter.